```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
                       FORT WORTH DIVISION
```

ISIDORE BRIDGEFORTH,              §
                                  §
            Petitioner,           §
                                  §
v.                                §    Civil Action No. 4:15-CV-146-Y
                                  §
LORIE DAVIS, Director,[1]         §
Texas Department of Criminal      §
Justice, Correctional             §
Institutions Division,            §
                                  §
            Respondent.           §

## OPINION AND ORDER

Before the Court is a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by petitioner, Isidore Bridgeforth, a state prisoner, against Lorie Davis, director of the Texas Department of Criminal Justice, Correctional Institutions Division, Respondent.

After having considered the pleadings and relief sought by Petitioner, the Court has concluded that the petition should be denied.

## I. FACTUAL AND PROCEDURAL HISTORY

In January 2010 Petitioner was indicted in the 29th Judicial District Court, Palo Pinto County, Texas, Case No. 14276C, for engaging in organized criminal activity by conspiring to commit the offense of possession of a controlled substance, cocaine, with

---

[1]Effective May 4, 2016, Lorie Davis replaced William Stephens as director of the Correctional Institutions Division of the Texas Department of Criminal Justice. Pursuant to Federal Rule of Civil Procedure 25(d), Davis is automatically substituted as the party of record.

intent to deliver. (Adm. R., Clerk's R. 1-2, ECF No. 9-6.) On November 4, 2010, a jury found Petitioner guilty of the offense, and the trial court assessed his punishment at thirty-five years' confinement and a $10,000 fine. (*Id.* at 60-61.) Petitioner appealed his conviction, but the Eleventh Court of Appeals of Texas affirmed the trial court's judgment and the Texas Court of Criminal Appeals dismissed his petition for discretionary review as untimely. (*Id.*, Mem. Op., ECF No. 9-2.) Petitioner also sought state postconviction habeas relief to no avail. (*Id.* Supp. Clerk's R., Writ 3 & Action Taken, ECF Nos. 10-8 & 10-1, respectively.[2]) This federal habeas petition followed.

The state appellate court set out the facts of the case as follows:

> Texas Ranger Michael Don Stoner worked as a narcotics agent in Palo Pinto and Parker Counties in the fall of 2009 for the Criminal Investigation Division of the Texas Department of Public Safety. While working undercover on September 11, 2009, he entered Jackie Lynn Smith's residence to purchase narcotics. Ranger Stoner encountered Robert Earl Jefferson Jr. at Smith's residence. Ranger Stoner sought to purchase $200 worth of crack cocaine from Jefferson. Ranger Stoner testified that, while he and Jefferson were completing the transaction, Jefferson recognized him as a former classmate from high school. Ranger Stoner and Jefferson had a discussion away from the others wherein Ranger Stoner asked Jefferson not to reveal his identity to the others. Ranger Stoner also asked Jefferson to contact him later for the purpose of getting Jefferson to assist Ranger Stoner in his investigation.

---

[2]These state records are not paginated; thus, the pagination in the ECF header is used.

Jefferson contacted Ranger Stoner on November 13, 2009, to provide information about the distribution of crack cocaine in the Mineral Wells area. Ranger Stoner testified that Jefferson provided him with the names of the individuals involved. Jefferson also identified the vehicles used in the distribution process, and he informed Ranger Stoner that the drugs were being obtained in Fort Worth. Jefferson also told Ranger Stoner the route that the suspects would take to and from Fort Worth.

Jefferson subsequently contacted Ranger Stoner on November 16, 2009, to inform him that Smith, [A]ppellant, and Brian Dukes would be going that day to purchase cocaine in Fort Worth. Jefferson further advised Ranger Stoner that the suspects would be driving a maroon Dodge pickup. Upon receiving this information, Ranger Stoner set up surveillance on Smith's residence in Mineral Wells. He observed [A]ppellant and Dukes loading Smith into the Dodge pickup that Jefferson had described. Ranger Stoner knew [A]ppellant and Smith on sight. Smith needed their assistance getting into the vehicle because he was handicapped.

Ranger Stoner and two other undercover narcotics agents conducted "moving surveillance" on Smith, [A]ppellant, and Dukes as they first ran some errands in Mineral Wells. The suspects then exited Mineral Wells on FM 1195 driving through Millsap to Interstate 20 and then to Fort Worth. After making several stops in Fort Worth, the suspects drove to a residence on Harlem Street in Fort Worth. Ranger Stoner testified that the residence belonged to Wayne Edward Allen. He observed [A]ppellant and Dukes meeting with Allen in his front yard.

The agents lost surveillance of Smith, [A]ppellant, and Dukes afterwards. Based upon information provided by Jefferson, Ranger Stoner and the agents drove back toward Mineral Wells on Interstate 20 in an attempt to reestablish surveillance. Ranger Stoner observed the Dodge pickup near the Brock exit. Ranger Stoner passed the suspects in the process of catching up to them. He observed [A]ppellant driving the pickup. Ranger Stoner exited Interstate 20 via the Brock exit, and the suspects did as well. While Ranger Stoner proceeded toward Millsap, the suspects turned onto Fairview Road. Ranger Stoner dispatched another agent to follow the suspects.

Appellant subsequently failed to negotiate a curve on Fairview Road, resulting in the pickup striking a tree. When agents arrived on the scene of the accident, [A]ppellant and Dukes were standing outside the pickup. Agents found a crack pipe in a nearby ditch and a rock of crack cocaine in the bed of the pickup near the area where appellant was standing. While agents arrested [A]ppellant for possession, Ranger Stoner spoke with Dukes away from the others. Dukes told Ranger Stoner that the group had acquired drugs in Fort Worth. Dukes also voluntarily removed a package containing crack cocaine from his sweatpants and gave it to Ranger Stoner. Ranger Stoner did not arrest Dukes at that time. Agents also did not arrest Smith. Instead, ambulance personnel transported Smith to the hospital for evaluation.

Dukes came to see Ranger Stoner on November 17, 2009, to be interviewed. Dukes agreed at that time to inform Ranger Stoner if anyone affiliated with Smith returned to Fort Worth for more drugs. Dukes called Ranger Stoner on November 19, 2009, to tell him that a group planned to return that day to Fort Worth for more drugs. Ranger Stoner established surveillance on Smith's residence at that time. He subsequently observed Billy Ray Herring loading Smith into a white Dodge pickup. Ranger Stoner also observed Wilbert Ratliff accompanying Smith and Herring in the pickup.

Ranger Stoner and other agents followed the suspects' vehicle to Fort Worth. They observed the suspects pulling into a church parking lot near Allen's residence. While Herring looked under the hood of the pickup, Ratliff walked across the street to Allen's house. Ranger Stoner testified that Ratliff was observed meeting with Allen. After Ratliff walked back to the pickup, the suspects drove back to Mineral Wells with Ranger Stoner and the agents following them.

As the suspects entered Mineral Wells, Ranger Stoner requested State Trooper Donnie Wright and Mineral Wells Police Officer Scott Mitcham to stop them. Trooper Wright stopped the vehicle for speeding. Trooper Wright initially spoke with Herring outside the vehicle. Trooper Wright subsequently removed Ratliff from the vehicle. Trooper Wright made the decision to arrest Ratliff when he found a crack pipe on him. As Trooper Wright was handcuffing Ratliff, Ratliff threw a baggie of crack cocaine into a nearby ditch. Trooper Wright permitted

4

Herring and Smith to leave, and he transported Ratliff to the DPS office for Ranger Stoner to interview him. Ratliff told Ranger Stoner that the drugs that he threw in the ditch came from Allen.

Ranger Stoner described Allen's role in the organization as the supplier of the crack cocaine. Ranger Stoner testified that Smith served as the connection to the source and supply. Smith also orchestrated the transport of crack cocaine from Fort Worth and its distribution in Mineral Wells. Ranger Stoner described the roles of [A]ppellant, Ratliff, Dukes, Herring, and Jefferson as assisting with the transport and distribution of crack cocaine in Mineral Wells. Ranger Stoner testified that the maroon Dodge pickup in which [A]ppellant, Dukes, and Smith traveled on November 16 belonged to Allen and that Allen provided it to Smith to use in traveling back and forth between Mineral Wells and Fort Worth.

Jefferson testified that Allen initially delivered cocaine to Smith at his residence in Mineral Wells and that he did so often. Jefferson also testified that Allen provided Smith with the maroon Dodge pickup for the purpose of transporting the cocaine from Fort Worth to Mineral Wells. Jefferson stated that he, [A]ppellant, Dukes, Ratliff, and Herring hung out at Smith's residence and that the money gleaned from the sale of cocaine went into Smith's wallet.

Dukes testified that Smith provided him with a place to stay and drugs on a daily basis. He admitted to traveling with Smith and [A]ppellant to Fort Worth on November 16 to purchase cocaine from Allen. Dukes testified that Smith accompanied them because it was his money and he was the one purchasing the cocaine. Appellant got the money from Smith to purchase the drugs, and he put the cocaine in Smith's coat pocket after the transaction occurred. Dukes removed the drugs from Smith at Smith's request after the wreck occurred. Dukes admitted to possessing the drugs when the officers arrived at the scene of the wreck.

When Dukes visited with Ranger Stoner the next day, he told Ranger Stoner about the organization and said that Smith was the "kingpin." Dukes testified that everyone helped Smith because of his handicap. He stated that the group would go to Fort Worth several times a

5

week to resupply and that he went along on several occasions. Dukes testified that Smith wanted to make the trip on November 19, 2009, to replace the drugs that were lost when Dukes was arrested on November 16, 2009. Dukes also testified that he had observed Allen coming to Smith's residence on several earlier occasions to deliver cocaine to Smith and that Allen gave the maroon Dodge pickup to Smith so that Allen would not have to come to Mineral Wells.

> Ratliff testified that he lived with Smith because he needed a place to stay and Smith needed assistance. Ratliff stated that Smith compensated him with a place to stay and later crack cocaine. Ratliff testified that Smith contacted Herring on November 19 so that they could use his pickup to travel to Allen's residence in Fort Worth. Ratliff testified that Smith accompanied them on November 19 because "[h]e's the man that took care of the business, you know." Ratliff stated that they called Allen while en route and that he met Allen at his door for the transaction. Ratliff also testified that Smith gave him the money to purchase the drugs.

(*Id.*, Mem. Op. 1-5, ECF No. 9-2.)

## II. ISSUES

In two grounds, Petitioner claims (1) that the state courts' "decision to deny petitioner's 5th and 14th Amendment claim was an unreasonable determination of facts in light of the evidence presented," and (2) that the state courts' "decision to deny petitioner's 6th and 14th Amendment claim was an unreasonable determination of facts in light of the evidence presented." (Pet. 6, ECF No. 1.) More specifically, Petitioner claims custodial statements he made to Mineral Wells police officer Scott Mitcham should have been suppressed because he had not been given his "Miranda warnings" when he made the statements. (Pet'r's Mem. 5-8,

6

ECF No. 2.) He also claims his appellate counsel was ineffective by failing to raise an ineffective-assistance-of-trial-counsel issue on appeal. (*Id.* at 8-10.)

### III. RULE 5 STATEMENT

Respondent admits that the petition is not barred by successiveness or the statute of limitations. But Respondent contends that Petitioner failed to exhaust his second ground for relief and that the claim is procedurally barred from the Court's review. (Resp't's Answer 10, ECF No. 18.)

### IV. DISCUSSION

**A. Legal Standard for Granting Habeas Corpus Relief**

A § 2254 habeas petition is governed by the heightened standard of review provided for by the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established Supreme Court precedent or that is based on an unreasonable determination of the facts in light of the record before the state court. *Harrington v. Richter,* 562 U.S. 86, 100-01 (2011); 28 U.S.C. § 2254(d)(1)-(2). This standard is difficult to meet but "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Harrington*, 562 U.S. at 102.

7

Additionally, the statute requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. The petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 399 (2000). Typically, when the Texas Court of Criminal Appeals denies relief in a state habeas-corpus application without written opinion, as in this case, it is an adjudication on the merits, which is entitled to the presumption. *Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997). Under these circumstances, a federal court may assume the state court applied correct standards of federal law to the facts, unless there is evidence that an incorrect standard was applied, and infer fact findings consistent with the state court's disposition. *Townsend v. Sain,* 372 U.S. 293, 314 (1963)[3]; *Catalan v. Cockrell,* 315 F.3d 491, 493 n.3 (5th Cir. 2002); *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001).

**B. Custodial Statements**

---

[3]The standards of *Townsend v. Sain* have been incorporated into 28 U.S.C. § 2254(d). *Harris v. Oliver*, 645 F.2d 327, 330 n.2 (5th Cir. 1981).

8

Petitioner claims his Fifth Amendment protections were violated by admission of custodial statements he made to Officer Mitcham implicating himself and Smith in the conspiracy because he had not yet been given his Miranda warnings when he made the statements. (Pet'r's Mem. 5-8, ECF No. 2.) Petitioner asserts that Officer Mitcham admitted that he "talked" to Petitioner, which "means that a two-way conversation took place." (Pet'r's Mem. 7, ECF No. 2.)

At a pretrial hearing, Officer Mitcham testified that on the night of November 11, 2009, Petitioner was "detained for paraphernalia" at the Mineral Wells Police Department. (Adm. R., Reporter's R., vol. 4, 37, ECF No. 9-10.) Petitioner requested to talk to the officer and informed the officer that he had information that would lead to the arrest of Jackie Smith. (*Id.*) Petitioner told the officer that he usually went with Smith to Fort Worth to pick up crack cocaine and that they also sometimes took Brian Dukes with them. (*Id.* at 38-39.) Petitioner also told the officer that they would always come through Millsap back into Mineral Wells and that he would let the officer know the next time they went. (*Id.* at 39.) Mitcham acknowledged that he did not give Petitioner the Miranda warnings before talking to him but stated that Petitioner's statements were voluntary and that he did not subject Petitioner to any questioning to elicit the information. (*Id.*) He also testified that he had no intention of questioning

9

Petitioner to elicit incriminating information and was not aware of any ongoing investigation involving Petitioner, Smith or anybody else in the case. (*Id.*) At the conclusion of the hearing, the trial court denied Petitioner's motion to suppress, providing:

> Well, you understand, of course, that the evidence that I have to consider in ruling on a motion to suppress is that which is adduced at this hearing. And a casual or a minute inspection of the record at this hearing, there is not one shred of evidence that was adduced pursuant to interrogation. Not one word.
>
> In the entire record of this hearing, is there any evidence that a statement was given pursuant to interrogation? And when you say, even if it's true, that's what this hearing is all about, is to determine if both custody and interrogation are getting married together. And if that's true, then there are rules to go by.
>
> And until you have custody and interrogation together, the cases are too numerous to name that differentiate between those two.
>
> The classic example, the case where a guy is parked out in front of the Sheriff's Department with his foot up on the bumper of his pickup, and the cops are asking him all kinds of questions, and he wasn't even close to being in custody.
>
> And although it's clearly interrogation by the police, there was no custody found. In this case, I will find that he was in custody. Absolutely. That's irrefutable. But there is zero evidence as to any interrogation, period, not pursuant to a question asked by you or the State or given by the witness.
>
> And without interrogation, then the parameters of . . . Miranda don't apply, and there's not one shred of evidence of trickery, even though you chose that word. There's not one evidence of coerciveness, even though you chose that word.
>
> And there has to be evidence of those things for it to form the basis of this Court making a ruling. So I'll

deny the motion to suppress.

(Adm. R., Reporter's R., vol. 4, 60-61, ECF No. 9-10.)

Petitioner also raised this claim in his state habeas application, and, based on the record, the habeas court found—

> After having reviewed the pleading and instruments on file in Cause 14276C-A, The State of Texas vs. Isidore Krishna Bridgeforth, the application on file in this cause, the Court is of the opinion and does hereby find that there are no controverted, previously unresolved facts material to the legality of the Applicant's confinement.

(*Id.*, Supp. Clerk's R., Writ WR-80,643-01, 3, ECF No. 10-7.) In turn the Texas Court of Criminal Appeals denied the application without written order on the trial court's findings. Petitioner asserts the state courts' decision was an unreasonable determination of the facts in light of the evidence presented during the hearing.

As noted above, under these circumstances, the Texas Court of Criminal Appeals' denial constitutes an adjudication on the merits, which is entitled to the presumption of correctness. Further, this Court may assume the state courts applied correct standards of federal law to the facts, absent evidence that an incorrect standard was applied, and infer fact findings consistent with the state courts' disposition of the issue. Implicit in the state courts' decision to deny Petitioner's motion to suppress is the implied finding that Petitioner initiated the conversation with Officer Mitcham, that there was no interrogation by Officer Mitcham, and that Petitioner voluntarily made the statements to the officer.

11

*Miranda* only requires that a recital of the warnings be given before custodial interrogation and does not reach a situation such as this where the statement is made voluntarily and not in response to any question by a police officer. *Miranda v. Arizona,* 384 U.S. 436 (1966). "Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody." *Miranda*, 384 U.S. at 444. "Interrogation . . . reflect[s] a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis,* 446 U.S. 291, 300 (1980). Petitioner asked to meet with Officer Mitcham and voluntarily made the incriminating statements to him. Petitioner fails to cite any facts or argument showing the encounter with Officer Mitcham was a custodial interrogation and thus Miranda warnings were required. Therefore, contrary to Petitioner's assertion, the state courts' adjudication of the matter was reasonable in light of the evidence and comports with Supreme Court precedent on the issue.

**C. Ineffective Assistance of Appellate Counsel**

Petitioner claims his appellate counsel, Cora Moore, was ineffective by failing to raise an ineffective-assistance-of-trial-counsel issue on appeal. (Pet. 6, ECF No. 1.) Respondent asserts this claim is unexhausted and procedurally barred. (Resp't's Answer 21-24.)

Applicants seeking habeas-corpus relief under § 2254 are required to exhaust all claims in state court before requesting

federal collateral relief. 28 U.S.C. § 2254(b)(1); *Fisher v. Texas*, 169 F.3d 295, 302 (5th Cir. 1999). The exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest court of the state on direct appeal or in state post-conviction proceedings. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-48 (1999); *Fisher*, 169 F.3d at 302; *Carter v. Estelle*, 677 F.2d 427, 443 (5th Cir. 1982). The exhaustion requirement is "not satisfied if the petitioner presents new legal theories or factual claims in his federal habeas petition." *Reed v. Stephens,* 739 F.3d 753, 780 (5th Cir. 2014) (quoting *Anderson v. Johnson,* 338 F.3d 382, 386 (5th Cir. 2003)).

In Texas, the highest state court for criminal matters is the Texas Court of Criminal Appeals. *Richardson v. Procunier*, 762 F.2d 429, 431-32 (5th Cir. 1985). Therefore, a Texas prisoner may typically satisfy the exhaustion requirement by presenting both the factual and legal substance of a claim to the Texas Court of Criminal Appeals in either a petition for discretionary review or, as in this case, a state habeas post-conviction proceeding. TEX. CODE CRIM. PROC. ANN. art. 11.07 (West 2015); *Depuy v. Butler*, 837 F.2d 699, 702 (5th Cir. 1988).

Petitioner raised six ineffective-assistance-of-appellate-counsel claims in his state habeas application, none of which sufficiently correspond to the instant claim. (Adm. R., Supp. Clerk's R. Writ 23-26, 35, 42, ECF No. 10-8.) Thus, the claim raised

13

for the first time in this federal petition is unexhausted for purposes § 2254(b)(1)(A). Under the Texas abuse-of-the-writ doctrine, however, Petitioner cannot now return to state court for purposes of exhausting the claim. TEX. CODE CRIM. PROC. ANN. art. 11.07, § 4(a)-(c). The abuse-of-the-writ doctrine represents an adequate state procedural bar to federal habeas review. *Nobles v. Johnson*, 127 F.3d 409, 423 (5th Cir. 1997). Therefore, a showing of cause and prejudice or a miscarriage of justice being absent here, the claim is unexhausted and procedurally barred from this Court's review. *Smith v. Johnson*, 216 F.3d 521, 523-24 (5th Cir. 2000).

For the reasons discussed, the Court DENIES Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 and DENIES a certificate of appealability.

SIGNED June 20, 2016.

_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE